Good morning, Your Honors. Mark Adams on behalf of William Hall. He is currently serving the Court's 24-month sentence upon the revocation of his supervised release. In this case, we are urging that the case presents a very unusual set of circumstances that significantly called into question the reliability of the hearsay statements of the complaining witness, Susan Hawkins. There is the very unusual timeline of events that suggests that her testimony or her statements given to the police officers and others were unreliable. The incident took place, allegedly, on the 25th of October, a Saturday night. It wasn't until sometime the next day, we don't know the exact time, that a phone message was left. With the United States Probation Officer, we are certain that the complaining witness, Ms. Hawkins, obtained that phone number by stealing the phone directory or phone book from Mr. Hall and from his residence. Then, some 12, 14 hours later, the complaining witness appears at the UCSD emergency room where she encounters a number of different people. She's first met with a triage nurse and then a resident, and then some four hours later, she meets with the attending physician who was the testifying witness at the trial, or at the revocation hearing. Dr. Grover has actually no independent memory of meeting with Ms. Hawkins or discussing anything with her. He simply read from the hospital's records. It is not until four days after the incident that a police report is first taken. There is no record and nothing in the record that shows that Ms. Hawkins may have made prior calls to the police department. This was a period of time when San Diego County was engaged in a significant firestorm that started, apparently, on the night of the 25th. And so, police resources were stretched thin, but there is no indication of any calls to the police department until the call on Wednesday, the 29th of October, four days after the incident. The United States Probation Officer gets a call the day before that from Mr. Hall, his usual weekly checking call. She doesn't call Mr. Hall and discuss the incident until four days after the incident when she first calls him. Mr. Hall is then arrested the next day and at about three o'clock in the morning. He is held in custody for five additional days. He's released from custody. The detective told the probation officer that there was problems with the case because of the delay in the reporting, and there was some question about the credibility of the witnesses. Finally, the probation officer makes her first attempt to contact Ms. Hawkins some ten days after she receives the first phone call from Ms. Hawkins on the 5th of November. We do not believe that good cause was shown for the failure to bring Ms. Hawkins to the hearing. The police officer did not get any identification number aside from the Social Security number. Police officer does not remember seeing even a photo identification. Police officer does not remember seeing a government-issued identification. There is no government-issued identification number that's recorded, no California ID number, no California driver's license number. And then the probation officer does nothing to follow up and try and find this witness until some ten days after she is first notified. With respect to Ms. Hawkins, she has no fixed address. There's no follow-up done by the detectives. There's, as we know, I think in our common experience, there are a number of causes of homelessness. There is some suggestion that Ms. Hawkins was a user of illegal drugs. She did go to the emergency room and was given a very serious pain medication. We don't know what animated her testimony or her statements to the police against Mr. Hall, but it could have been involved with substance abuse. It could also have been involved with some form of mental illness. We simply don't know, and no testing was done either at the medical center or in any other setting to determine what was going on with Ms. Hawkins. The only way to really guarantee due process to Mr. Hall in this circumstance was to have allowed him to confront and cross-examine the witness against him. Counsel. Yes, sir. Doesn't there's a witness there where you first slapped Ms. Hawkins supposedly? This guy named Red? Yes, Red. That's the corporal injury count right there, right? Your Honor, I don't think it answers the question altogether. I think that there's a need to confront the person involved who is providing the testimony from her perspective. He saw an argument. He's also charged with not reporting the police contact, correct? That was one of the probation violations? Actually, no, it wasn't, sir. The other two violations had to do yes, it was. I'm sorry, you're right. The fourth allegation was he didn't report that he was in the jail. Judge Jones at the trial court level found that that was not a founded violation of supervised release, and he based that on the fact that during her testimony, probation officer Bergen testified that she knew Mr. Hall was in the jail, that she had been alerted by other authorities, and that there was no real mechanism for Mr. Hall to make a call to her office. The other allegation was associated with a felon named Red? Yes, sir. Who testified at the hearing? Yes, sir. And, again, Judge Jones found that that allegation was not founded because Red did testify during the hearing that although he knew that Mr. Hall, our Mr. Hall here in this case, was on supervised release, that he, Red, also coincidentally named Mr. Hall, he did not tell our Mr. Hall in this case that he was on supervised release, and so there was nothing in the record to affirmatively show that Mr. William Hall knew that Red was on supervised release, and so Judge Jones found that that allegation was not proven. So you want us to extend Crawford to a supervised release hearing? Your Honor, I don't ask the Court to extend Crawford to all supervised release hearings. I ask the Court to recognize the bedrock procedural guarantee of confrontation that is discussed in Crawford and I think very importantly pointed out by the Supreme Court, and to recognize that in some circumstances, some unusual circumstances such as those presented in this case, that confrontation and cross-examination is the only meaningful way to test the reliability of a reporting witness. And we believe that in this case Mr. Hall should have been permitted the opportunity to confront and to cross-examine his accuser who really I think had perhaps a variety of motives in providing her statement to the police, anger, jealousy, vindictiveness and so on. We do know that she stole his address book, that she had engaged in a fairly significant argument with him, as pointed out by Red during his testimony. And we believe that under the circumstances of this case, particularly the circumstances of the reporting person, Susan Hawkins, that Mr. Hall should have been permitted the opportunity to confront, to cross-examine her, and the district court should have been permitted the opportunity to assess the credibility of this witness by observing her demeanor during that testimony. Thank you very much. Thank you, counsel. Good morning. May it please the Court. Mark Rahe for the United States. I'd like to address the issues as they were raised by defense counsel. First off, talking about the reliability of this absent complaining witness, in his presentation it appears that defense counsel wants to focus on a lot of speculation or various things that were absent from the record. In bringing up things as we don't know if she's a user of illegal drugs, she might have had mental problems, there's no evidence of that in the record whatsoever. This standard, the standard of view here is abuse of discretion whenever there's a question of the inclusion or exclusion of evidence. In this case, I don't want to focus on what wasn't there. We have to look at what the district court found was there. And for reviewing the record at the time, for reviewing the record in preparation from this case, there was corroboration up and down the board in this case. I mean, you start out with, first off, the percipient witness read, as Judge Collins pointed out. He testified that he directly, he put the victim in that same hotel room or not hotel room, apartment room of the defendant on the night of October 25th. He confirmed that there was an argument between the victim and the defendant as she had claimed. And he also saw with his own two eyes the defendant strike the victim with her, with his hand. Aside from that, percipient testimony, you have admissions of the defendant himself, which defense counsel didn't talk about. In a phone call of October 29th, the conversation between the defendant and the probation officer, the defendant admitted two separate times to slapping the defendant with his hand or the victim with his hand. That's another piece of corroboration. And then aside from that, the third most important thing is the independent medical evidence. The very next day after this alleged incident, the victim reported to the UCSD emergency room. She was seen by Dr. Grover. He testified at the revocation hearing that in his opinion, what he saw, the evidence that he saw was consistent with her claim that she had been struck with an open hand. And, in fact, he further testified that nothing that he saw was inconsistent with that. And he saw confusions, and that was what his diagnosis was. And he even prescribed Vicodin, which is obviously something that you need a doctor's prescription for. And there was further corroboration of that. Three or four days later, the police officers in this case took pictures. And you have those, I believe, at the last page of the supplemental excerpt of record. And we even reproduced them in color. Both the police officers who took those pictures testified that they could see bruising at the time. And the doctor verified that those were the bruises, and those were all in the exact places that the victim claimed to have been hit, chest, back, and her left arm. And aside from that, looking at all the details, I mean, the victim's statement here, it wasn't just a three-sentence, oh, I was hit by Mr. Hall, and I want you to press charges. She gave a very detailed chronological account which accounted for a three-hour very traumatic incident in the apartment of Mr. Hall that night. And there are a lot of little details that she provided in that story that were later corroborated. The golf club. She claimed that when she tried to leave that room, the defendant took a golf club that he kept behind the door and said, you know, I'm going to mess you up, or he used other words to that effect, if you try to leave. When he was later arrested, the police looked exactly where she said that golf club would be. That's where they found it. On the day of the arrest, the defendant allegedly went to the homeless shelter where the victim was residing, and she noticed the Band-Aid under his right eye. And security told him to leave that morning. Later that night, the police go to arrest the defendant. He has the Band-Aid. She said that he was on parole. It's true. He was on supervised release. She said that she took refuge, and her phone call to the probation officer the day after this incident, she said, I'm going, I'm at St. Vincent de Paul's. We later confirmed that she, in fact, was there. She claimed the day after the incident attacked, and that same voicemail to the probation officer, I'm going to report this to police. Three or four days later, she finally did. Now, I know that there's some question about, well, there's this three- or four-day gap. Well, what was her reason for the delay? She said there were these terrible fires. There was no dispute about that in the district court. October 26, 2003, the Cedar Fire firestorm, one of the worst in San Diego County history, was raging out of control. The district judge found that. The defense counsel conceded that. And there was even testimony from Officer Gross at the revocation hearing that on that day, resources were being diverted in order to evacuate areas. Just another piece of corroboration. And finally, as far as the false imprisonment, she's claimed that she couldn't escape. We found that we had evidence that this apartment on the second floor was a 12- or 15-foot drop. It only had one door and one window. That's that's you can't reasonably expect somebody to take those measures. And finally, as far as corroboration, Your Honor, I would point out, I don't believe that there's anything that the defendant or that the victim ever said that was disproven or objectively shown to be false. So on that record, with all those affirmative factors, I don't believe it can be said that the district court abused his discretion under the Comedo balancing test. And as far as that issue, that's pretty much the only law. The test is clear. You weigh the strength of the confrontation interest against the government's good cause for not having a witness there. We worry about that argument, about the lack of good cause. We believe that there was good cause in this case, Your Honor. First and foremost, this woman was, by her own admission, a homeless woman. We didn't have an address. She claimed that she took refuge at St. Vincent de Paul. On November 5th, 2003, the probation officer contacted the staff and said, I'd like to speak to this woman. Just less than a week and a half later, and she was told that the victim's family had come from out of State, taken her away, and left no forwarding address. And as I represented to the district court, I also made my own independent query of St. Vincent de Paul's and confirmed that. And even the defendant himself, in that phone conversation with his probation officer on October 29th, he admitted that the way he described this woman is she is out in the streets and he didn't even know where she was. But aside from that, the only thing we had at the time when she was interviewed by the San Diego Police Department was she gave her date of birth and her social security number. And as was also represented to the district court at the conclusion of the revocation hearing last April, we had somebody in our office run for their standard databases that are used, California Department of Motor Vehicles and also criminal rap sheet, because, again, you've got to remember, this defendant claimed that she was a prostitute. There's no, absolutely no evidence of that. But we represented the district court that we had made these inquiries, and the same information was turned over to the defense. And the district court specifically found at page 145 of the supplemental excerpts of record, I don't know what else could be done beyond that. And frankly, I think under the circumstances, I would tend to agree with that. And this case couldn't be more distinguishable from the Comedo case on those grounds. In that case, the absent witness had been visiting the defendant in jail up until the day of the revocation hearing. In fact, the defense counsel represented that just a half hour prior to the hearing, and he had spoken with her outside the courtroom. There is nothing of the kind here. This complaining witness did not have any forwarding address. There was no other information. So for the defense to knock us for not subpoenaing her, how are we supposed to do that when we don't even know where she lives? But, again, looking at this through the lens of abuse of discretion, I don't see how it can be credibly maintained that the district court abused its discretion. And with the remainder of my time, I'd just like to talk about the Crawford issue. And I know that the question was posed to defense counsel, should we extend Crawford or not, and the answer was, well, maybe in some cases you do, in some cases you don't. I don't believe that's an appropriate answer. It either applies or it doesn't. If you want to take a case-by-case balancing as to protecting confrontation rights, you already have that. That's the Comedo case, the Comedo test from 1999, which this Court applied here. And I have to apologize. I know I believe I sent up at least 628J letters. This is a hot issue right now, and we would like this Court to decide this. And it's not writing on a blank slate. I believe, by my count, there are at least six courts that have found that Crawford doesn't apply to supervised release context, and two of them are Federal circuit courts' appeal, I believe the Second Circuit and the Eighth Circuit. So unless this Court wants to create a circuit split, we have to look at the logic that drove those decisions. And first and foremost, Crawford, by its very terms, is a strictly Sixth Amendment jury trial case. In the plain language of the Sixth Amendment, only applies in all criminal prosecutions. And as the Supreme Court held over 30 years ago in the Gagnon and Morrissey cases, parole revocation and probation revocation are not stages of a criminal prosecution. They're chiefly remedial in nature. It's not the same kind of context. In this Court, in the Soto Olivas decision, at 44F3rd at page 792, has extended that reasoning to supervised release revocation hearings. They're not part of a criminal prosecution. Now, aside from that plain language argument, there's just basically, in Gagnon and Morrissey, where did the Supreme Court draw its source for a confrontation right and revocation context? They did so from the due process clause. At no point in those cases, except in a dissenting opinion, and I note in, I believe, my opponent's brief, besides a concurring opinion from Justice Douglas, it was actually a dissenting opinion. And it's in a different context. It's a quote from a case that's McElroy v. Green, I believe, that's not even criminal. You look at the majority opinions in those cases, there's not a single mention of the Sixth Amendment. And the Supreme Court knows how to incorporate, by reference, the Sixth Amendment into the Fourteenth Amendment due process clause when it wants to, and it did so in the Poynter v. Texas case, just seven years before Morrissey and Gagnon. And finally, Your Honor, I would point out that in Morrissey, the Supreme Court expressly cautioned a parole revocation hearing should not be equated with a jury trial, and that the rights are not similar. It's a quote from that opinion at page 489. There is no thought to equate this second stage of parole revocation to a criminal prosecution in any sense. And at page 480, they say the full panel plea of rights to a defendant in such a proceeding of jury trial does not apply to parole revocations. And for that reason, we would ask that this Court find that Crocker does not apply to supervised release to join the district court's opinion in Braza and the majority of weight out there. And I see my time's up, and unless this Court has any further questions, I would submit. All right. Thank you, counsel. Your Honors, I only want to point out that Mr. Hall is serving two years in prison. He was never allowed to confront and cross-examine his accuser. We believe that implicates the due process clause, and we believe that in this case, under these facts and circumstances, he should have been allowed to confront and cross-examine the woman who was providing this very damaging testimony against him. Thank you. Thank you, counsel. U.S. v. Hall will be submitted. We will move on to the PMPA cases and take up Doss v. Tosco. Thank you, counsel. Thank you.
judges: Tashima, Wardlaw, Collins